# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARIA RALUCA CARTY, DMD, LUTHER OXENDINE, and CAROL ARMSTRONG, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAFE HOME SECURITY, INC., a Connecticut corporation,<br><br>Defendant. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**February 5, 2018** |

Plaintiffs, Maria Raluca Carty, DMD, Luther Oxendine, and Carol Armstrong (collectively, "Plaintiffs"), bring this action against Defendant Safe Home Security, Inc. ("Safe Home" or "Defendant"), by and through their attorneys, individually and on behalf of all others similarly situated, and allege as follows:

## INTRODUCTION

1.      This is a class action lawsuit brought by Plaintiffs on behalf of all similarly situated persons who contracted for the purchase of home security systems from Defendant.

2.      Safe Home sells 24-hour monitored home alarm systems and products throughout the United States.

3.      This action arises from Safe Home's wrongful renewal and refusal to cancel customer contracts after the customers cancelled those contracts.

4.     Customers were unable to cancel their contracts because Safe Home has implemented an ambiguous, coercive, and deceptive process by which customers must notify Safe Home in order to prevent automatic renewal of the contracts.

5.     Plaintiffs entered into contracts with Safe Home entitled "Agreement for Monitoring and Installation of Security Systems," pursuant to which Safe Home agreed to provide the necessary home security equipment and "provide monitoring service[s]" for a period of 36 months or longer.

6.     Safe Home's contracts contain an automatic renewal clause that automatically renews the contract for an additional 12 months unless the customer notifies Safe Home, in writing and 60 days before the contract termination/renewal date, of their desire to terminate the contract.

7.     When Plaintiffs and other customers requested to terminate their contracts with Safe Home, they received a wide array of vague, misleading, and dishonest responses. Defendant either told some customers they could not cancel the contract, that Safe Home did not receive the customer's notice of cancellation, or that their contracts had been cancelled, only to find out later that Safe Home had actually renewed their contract.

8.     As a result, Plaintiffs and other customers were forced to continue to pay Safe Home despite the fact that they were no longer using Safe Home's equipment or services and did not consent to receive those services.

9.     Had Plaintiffs and Class members known about Defendant's wrongful practices, they would not have purchased Safe Home's products and services.  In fact, some customers never intended to use Safe Home's services and only found out Safe Home had assumed the

customers' contracts from other security companies after notifying the other companies of their desire to cancel the contracts.

10.     The only reason Plaintiffs and other customers' contracts were renewed is because Defendant deceived and misled them, and because Plaintiffs and other customers relied on Safe Home's statements that the contracts would not renew.

11.     Even after notifying Safe Home of the fraudulent and deceptive nature of its billing practices, Safe Home has failed to take any actions or precautions to prevent or correct the billing and termination procedures that deceived Plaintiffs and Class members.

12.     Accordingly, Plaintiffs bring this action to redress Defendant's violations of Connecticut's Unfair Trade Practices Act, Michigan's Consumer Protection Act, North Carolina's Unfair and Deceptive Trade Practices Act, and Missouri's Merchandising Practices Act, and Breach of Duty of Good Faith and Fair Dealing, Breach of Contract, and Unjust Enrichment.

## PARTIES

13.     Plaintiff Maria Raluca Carty, DMD ("Plaintiff Carty") resides in North Platte, Nebraska.

14.     At the time that Plaintiff Carty signed the contract with Defendant in September 2014, she resided in Lawrence, Michigan.

15.     Plaintiff Luther Oxendine ("Plaintiff Oxendine") resides in Maxton, North Carolina.

16.     Plaintiff Carol Armstrong ("Plaintiff Armstrong") resides in Independence, Missouri.

17.     Plaintiff Armstrong changed her name from Carol Ward to Carol Armstrong after her marriage in 2016.

18.     Defendant, Safe Home Security, Inc., is a privately held company established in 1988.  Safe Home is a Connecticut corporation with its principal place of business at 1125 Middle Street, #101, Middletown, CT 06457.

19.     Safe Home sells security monitoring services and equipment under its own name and through fully owned subsidiaries.  These subsidiaries operated in substantially the same manner as alleged in this Complaint.  Plaintiffs reserve the right to add any of Safe Home's subsidiaries or other corporate affiliates as defendants to this action based on discovery and further investigation.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

21.     This Court has personal jurisdiction over Defendant because it has conducted substantial business in this judicial district, and intentionally and purposefully placed its security systems into the stream of commerce within Connecticut and throughout the United States.

22.     Venue properly lies in this District pursuant to 28 U.S.C. §1391 because a substantial part of the events and omissions giving rise to these claims occurred in this District. Venue is also proper because Defendant is authorized to conduct business in Connecticut and has

intentionally availed itself of its laws and markets, and is subject to personal jurisdiction in this District.

FACTUAL BACKGROUND

**A.    Background on Safe Home and Its Deceptive Contracting Practices**

23.    Safe Home describes itself as being "a company that cares,"[1] and explains that "[a]fter two decades in the security industry, we know that when it comes to protecting families, businesses and valuables, people want the very best in the way of monitored security services."[2]

24.    According to *SDM*, a security industry magazine, Safe Home is in the top 10 of security companies based on recurring monthly revenue with 206,756 subscribers nationwide.[3] Safe Home earned $8,393,147 in recurring monthly revenue as of December 31, 2016, which was up almost 20% from the year before.[4]

25.    Safe Home provides its services pursuant to a multi-year contract with Plaintiffs and Class members, charged on a monthly basis.

26.    However, Safe Home's contract does not end at the conclusion of the original contract term; instead, the contract automatically renews for an additional 12-month period.

27.    The only way to prevent the contract from renewing for another 12-month period is for the customer to provide notice in writing to the Defendant 60 days before the contract expires.

28.    Specifically the contract states, "[t]his agreement shall automatically renew without action by either party under the same terms and conditions for successive periods equal

---

[1]     http://safehomesecurityinc.com/about.html (last visited Feb. 2, 2018).

[2]     http://safehomesecurityinc.com/index.html (last visited Feb. 2, 2018).

[3]     https://www.sdmmag.com/2017-SDM-100-Rankings (last visited Feb. 2, 2018).

[4]     *Id.*

to twelve (12) months unless either party gives to the other at least sixty (60) days written notice, prior to expiration date, of intention to terminate this Agreement upon any expiration date."[5]

29.     The contract does not further elaborate on the requirements of the written notice. The contract does not include the expiration date.  Defendant does not explain where to send the notice nor what to include in the notice.

30.     The contract also contains an "Early Cancellation" provision that states, "[c]lient may cancel prior to completion of primary or renewal term upon receipt of ninety percent (90%) of stated terms.  Applicable for sale of home, death and transfers.  All cancellation requests must be in writing."[6]

31.     Eventually the wording of this cancellation policy changes.  A later version of the contract, signed by Plaintiff Armstrong, states that "[c]lient may cancel this agreement before the end of the primary or renewal term only upon sale and relocation from the above property address.  Client must provide written notice to the Company 60 days prior to such cancellation, return any Company owned property, and provide the name, address, and telephone number of the new owner(s) of the aforementioned property.  Should the client cancel under the above stated terms, the difference between the number of months of monitoring paid and 30 months shall be immediately due and payable to the company."[7]

32.     Plaintiffs followed the terms of their contracts with Defendant when they attempted to cancel the contracts, prevent renewal, or request assistance in transferring the equipment before moving.

---

[5]     *See* Plaintiff Carty's contract, attached as Exhibit A.  All other contracts at issue in the case contain substantially similar language, and any relevant differences will be addressed.

[6]     *See* Exhibit A.

[7]     Plaintiff Armstrong's contract is attached as Exhibit B.

33.     Plaintiffs often called Safe Home with questions or to confirm that they had cancelled the contract or prevented renewal.  Safe Home's customer service was not helpful, provided misinformation, and never offered additional detail about the cancellation or renewal process.

34.     As a result, Plaintiffs were unable to cancel their contracts or prevent their renewal.  Instead, Defendant forced Plaintiffs to pay for services that they did not want or were no longer using.

**B.     Plaintiff Carty's Experience**

35.     In approximately September 2014, Plaintiff Carty contacted Defendant to inquire about purchasing a security system for her home.

36.     Plaintiff Carty asked whether the Defendant's home security systems were transferable to another state in the event that she moved.  Defendant informed her that the security system would be transferable and that Plaintiff simply needed to contact Defendant to transfer the security equipment from one home to another.

37.     Defendant's website indicates that it will help customers in "setting up an appointment for uninstalling the system," and that they will "get to keep the system with [them] until [they] move into [their] new home.  Once there [their] customer service department will help [them] in setting up an installation appointment."[8]

38.     On or about September 26, 2014, Plaintiff Carty signed a contract with Defendant for a three-year term of service at a monthly monitoring charge of $42.99.[9]

---

[8]     http://www.safehomesecurityinc.com/faq.html (last visited Feb. 2, 2018).

[9]     *See* Exhibit A.

39.     During the process of signing the contract, Plaintiff Carty informed Defendant that she and her husband would be moving during the duration of the contract because they were living in Michigan while Plaintiff Carty's husband pursued his Master's degree.

40.     At the end of November 2015, Plaintiff Carty informed Defendant that she was moving from Michigan to Nebraska and requested a technician service call to relocate her home security system.

41.     In the roughly two months leading up to her move to Nebraska, Plaintiff Carty repeatedly called Defendant requesting a service appointment.  At no time prior to her move did the Defendant come to her home and help her pack the home security system for the move.

42.     Plaintiff Carty was eventually forced to dismantle and relocate the home security system herself.

43.     Shortly after moving to Nebraska in January 2016, Plaintiff Carty called Defendant to cancel her contract approximately 20 months prior to the expiration date. Defendant informed Plaintiff Carty that she had to finish paying the remaining months of the contract, but after that the contract would not automatically renew.

44.     Plaintiff Carty relied on Defendant's representation that she had cancelled the contract properly and that the contract would not automatically renew at the next expiration date.

45.     But Plaintiff Carty should have been able to cancel her contract with Defendant pursuant to the Early Cancellation provision.

46.     Defendant did not inform Plaintiff Carty that "upon receipt of ninety percent (90%) of stated terms" or roughly the amount of 18 monthly payments, she could cancel the contract pursuant to the Early Cancellation provision.

47.     Plaintiff Carty did not install or use the home security system once she moved to Nebraska but kept paying for the service, despite Defendant's failure to perform its duties under the contract.

48.     In September 2017, Plaintiff Carty called Defendant to confirm that the contract had been terminated.  To Plaintiff Carty's surprise, Defendant informed her that she had failed to properly cancel the contract and that, as a result, it had renewed for an additional 12-month period.

49.     Defendant justified the renewal by stating that Plaintiff Carty was required to provide 60 days' notice to cancel and, if not provided, the contract would renew for another 12 months.

50.     Plaintiff Carty informed Defendant that she had provided approximately 20 months' notice to Defendant and that Defendant had confirmed with her at that time that her contract would not renew, yet Defendant still refused to cancel the contract.

51.     Instead of recognizing that Plaintiff Carty provided more than enough notice of her desire to cancel the contract prior to its automatic renewal or acknowledging that Plaintiff Carty could have cancelled her contract pursuant to the Early Cancellation clause, Defendant offered to provide new equipment and another three-year contract.

52.     Defendant never provided Plaintiff Carty notice explaining that she may cancel the contract, and the procedure for such cancellation prior to the time for cancellation, or renewal of the contract.

**C.       Plaintiff Oxendine's Experience**

53.     On or about December 2, 2009, Plaintiff Oxendine signed a contract with Security Force, Inc. ("Security Force") for a five-year term of service at a monthly monitoring charge of $39.95.[10]

54.     The Security Force contract also contains an automatic renewal provision that requires 60 days written notice in order to prevent automatic renewal.  The contract states, "[t]his agreement shall automatically renew for a period of 12 months at the end of such primary term or any renewal term thereafter unless the client shall give written notice to the Company sixty (60) days prior to the end of the primary term or any renewal term."

55.     The Security Force contract also allows for early cancellation if the client sells or relocates from their current home.  The contract states, "[c]lient may cancel this agreement before the end of the primary or renewal term only upon sale and relocation from the above property address.  Client must provide written notice to the Company 60 days prior to such cancellation, return Company owned property, and provide the name, address, and telephone number of the new owner(s) of the aforementioned property.  Should the client cancel under the above stated terms, the difference between the number of months of monitoring paid and 30 months shall be immediately due and payable to the company."

56.     At an unknown time between December 2009 and June 2016, Defendant began providing security monitoring services for Plaintiff Oxendine.

57.     On information and belief, Security Force assigned its contract with Plaintiff Oxendine to Defendant pursuant to the terms of the Security Force contract.

---

[10]       The Security Force contract is attached as Exhibit C.

58.     Plaintiff Oxendine was not aware that his security monitoring services had been transferred to Defendant, and Safe Home never sent Plaintiff Oxendine notice that it was now providing the security monitoring services for him.

59.     The original term for the Security Force contract ended on December 2, 2014, when it automatically renewed for additional 12 months pursuant to the contract terms.  The first renewal term of the Security Force contract expired December 2, 2015, and the Security Force contract automatically renewed for another 12 months to December 2, 2016.  This second renewal term expired and the contract was automatically renewed again with an expiration date of December 2, 2017.

60.     Defendant provided Plaintiff Oxendine with an "Agreement for Monitoring and Installation of Security Systems," dated June 6, 2016 with a three-year term and a monthly monitoring charge of $39.95.

61.     Plaintiff Oxendine did not sign the June 6, 2016 agreement because he already knew he might no longer need Defendant's monitoring services going forward.

62.     Plaintiff Oxendine never signed an agreement with Defendant.  The parties were both operating under the Security Force contract that was set to automatically renew on December 2, 2017 unless Plaintiff Oxendine provided 60 days' notice to Defendant that he did not want to renew the contract.

63.     Sometime before August 2017, Plaintiff Oxendine cancelled his home's telephone service, which is how Defendant's security systems operate.  Plaintiff Oxendine relied only on his cellular phone service and was planning to switch to a security company that used cellular phone service rather than land line services.

11

64.     Therefore, on or about August 4, 2017, Plaintiff Oxendine sent a letter to Defendant clearly stating his intention to cancel his services with Defendant.  The letter begins by stating, "I am providing notice that I will no longer need to utilize Safe Home Security, Inc. to monitor my alarm service."[11]

65.     Plaintiff Oxendine's letter is dated August 4, 2017, which is exactly 120 days prior to the end of the third renewal term of the Security Force, Inc. contract.

66.     Once Plaintiff Oxendine changed his phone service, he stopped using Defendant's services, and Defendant continued to bill Plaintiff Oxendine for the services he was not using, on a contract he properly cancelled.

67.     Plaintiff Oxendine subsequently sent his August 4, 2017 letter to Defendant attached to Defendant's invoice because Safe Home continued to bill him for services he was not using, on a contract he properly cancelled.[12]

68.     Besides the basic terms of the contract, Defendant never provided Plaintiff Oxendine with notice explaining that he may cancel the contract and the procedure for such cancellation prior to the time for cancellation or renewal of the contract.

**D.     Plaintiff Armstrong's Experience**

69.     On or about June 9, 2012 Plaintiff Armstrong signed a contract with Security One International, Inc. ("Security One") for a five-year term of service at a monthly monitoring charge of $29.99.[13]  The Security One contract term expired on June 9, 2017.

---

[11]     The letter is attached as Exhibit D.

[12]     The invoice and the letter are attached as Exhibit E.

[13]     The Security One contract is attached as Exhibit F.

70.     In August 2013, Plaintiff Armstrong moved from Belton, Missouri to Independence, Missouri.

71.     Before Plaintiff Armstrong moved, she contacted the number on her contract with Security One to request their assistance in transferring her security system to her new home. Plaintiff Armstrong was not aware at the time that she was speaking with Defendant rather than Security One.

72.     Plaintiff Armstrong was not aware that her security monitoring services had been transferred to Defendant, and Safe Home never sent Plaintiff Armstrong notice that it was now providing the security monitoring services for her.

73.     Defendant transferred the security system from Plaintiff Armstrong's home in Belton, Missouri to her new home in Independence, Missouri.

74.     After her move, Defendant requested that Plaintiff Armstrong sign a new contract. This was the first contract between Plaintiff Armstrong and Defendant.

75.     On or about August 8, 2013 Plaintiff Armstrong signed a contract with Safe Home for a 46-month term at a monthly monitoring charge of $29.99.[14]

76.     After her move, Plaintiff Armstrong's security alarm went off three times, and each time Defendant directed the police to her old address in Belton, instead of the correct address for her new home in Independence.

77.     Dissatisfied with Defendant's services, Plaintiff Armstrong wrote a letter to Defendant, dated May 25, 2017 to cancel the contract with Defendant.

---

[14]     *See* Exhibit B (Safe Home/Armstrong contract).

78.     In September 2017, Plaintiff Armstrong received another bill from Defendant, and Plaintiff Armstrong stapled her check to a copy of her May cancellation letter and sent both to Defendant.

79.     Plaintiff Armstrong repeatedly contacted Defendant to confirm the cancellation of the contract, but Defendant claimed it did not receive her letter and refused to cancel the contract and its services.

80.     During one call Plaintiff Armstrong made to Defendant, she asked whether the contract had actually been renewed, Defendant's representative informed her, "this is no bullshit" and hung up the phone.

81.     The original term of the contract expired on June 8, 2017 and the contract automatically renewed for an additional 12 months.  The renewal term will expire on June 8, 2018, and in order to prevent automatic renewal, Plaintiff Armstrong needs to provide notice of cancellation by April 9, 2018.

82.     Defendant has never informed Plaintiff Armstrong how she may cancel the contract and is refusing to acknowledge her cancellation.

83.     Defendant should acknowledge that Plaintiff Armstrong's contract will not renew on June 8, 2018, at the very least.   Plaintiff Armstrong's cancellation letter was sent approximately 380 days prior to expiration of the renewal term on June 8, 2018.  Defendant still refuses to acknowledge that Plaintiff Armstrong has cancelled her contract.

84.     Additionally, Defendant changed the term of Plaintiff Armstrong's contract to 46 months.  This set an expiration date of June 8 instead of August 8, the only date listed on the contract.  If the date had remained August 8, her May letter would have been sent 76 days prior to renewal, and her cancellation would have been proper.

85.     Since sending the cancellation letter, Plaintiff Armstrong has not consented to receiving Defendant's services, but Defendant has continued to bill her for its services.

86.     Besides the basic terms of the contract, Defendant never provided Plaintiff Armstrong with notice explaining that she may cancel the contract and the procedure for such cancellation prior to the time for cancellation or renewal of the contract.

### E.   Experiences of Other Safe Home Customers

87.     Plaintiffs' experiences are by no means isolated or outlying occurrences.  The Internet is replete with examples of consumers complaining of the same deceptive and coercive acts by Defendant that Plaintiffs experienced.  There is even a Facebook page with more than 700 followers called "Customers against Safe Home Security, Inc."[15] as well as a blog entitled "Safe Home S*cks."[16]

88.     The following quotes are recent and representative examples of the hundreds of customer complaints about Defendant's deceptive and coercive contract renewal practices across various websites:

### Yelp[17]

**04/06/17:**

> "We cancelled in 2015 but supposedly SHS didn't receive our written confirmation on time even though it was sent months before it was due.  So, we have paid $43.95 for the past 12 months while having ADT as our service provider.  Paying 2 bills isn't funny, nor frankly acceptable, but we did just that.  Now, a year later my husband has called them multiple times over the last year to confirm that this is all set, they have their paperwork, and our last payment will be in March of 2017.  Well it's April 6th and guess what?  We just confirmed that these conniving, sleazy SOB's just withdrew the

---

[15]     https://www.facebook.com/Customers-against-Safe-Home-Security-Inc-345582505466442/ (last visited Feb. 2, 2018).

[16]     http://safehomesucks.blogspot.com/?view=classic (last visited Feb. 2, 2018).

[17]     https://www.yelp.com/biz/safe-home-security-middletown?start=20&sort_by=date_desc (last visited Feb. 2, 2018).

$43.95 again.  This company is as dirty as I've ever seen, this goes beyond what we could anticipated they'd pull.  This rating is earned, and we will now see how they handle the Attorney General is being informed o[f] their shady behavior.  Never do business with this company!"

**09/14/17:**

". . . I was committed to a 3 yr . . .  contract. My contract expired, but I continued the service on a month to month basis. I gave notice 7/31/17 to cancel their service. I was charged for August for 30 day cancellation fee.  THEN September I was charged again. They then argued I still had til[l] December on my contract. WRONG.  No one at SHS will confirm that I wont [sic] be charged again, let alone receive a credit for THEFT of September's fee. It is stealing when you take what's not yours!"

**Better Business Bureau**[18]

**02/10/16:**

"This company has no way out of their contract and when you call to try and talk to them they just tell you to pay the remainder of the contract.  They are also very rude when trying to talk about possible solutions to billing issues or customer problems."

**12/27/17:**

"I signed up for home alarm system with Safe Home Security, 2 accounts, my home and had a system with life alert put in for my wife's parents. 2 years into my 5 year agreement had an issue with auto draft and had past due payments. Was treated rudely when tried to resolve and correct bank information. I was told I would need to sign a new 5 year contract and upgrade my system or they would no longer monitor my alarm system. I refused and advised I have a contract already I do not want to extend it, if they want or need to upgrade the equipment I should not be responsible for that. They demanded I upgrade and sign new contract and reconfirmed they would refuse to monitor my systems. I point blank ask them, so if a life alert or fire happens you will refuse to contact emergency services? Was told yes they will refuse to contact emergency services even though they are being paid to. I have continued to pay them monthly to keep from defaulting on account and now they are demanding I sign a new contract or pay them $1752 per account to terminate my contract, even though they are being paid for a service they refuse to provide."

**Consumer Affairs**[19]

**09/13/16:**

---

[18]     https://www.bbb.org/connecticut/business-reviews/burglar-alarm-systems-dealers-monitoring-and-service/safe-home-security-inc-in-middletown-ct-47000796/reviews-and-complaints?section=complaints (last visited Feb. 2, 2018).

[19]     https://www.consumeraffairs.com/homeowners/safe_home_security_ct.html?page=2 (last visited Feb. 2, 2018).

"5 years ago signed home security contract with Point Home Security, now known as Safe Home Security.  Per original contract I just need to give them 30 days notice of termination before contract end.  Safe Home said we didn't give them the 60 days required per their contract.  Now they renewed our contract for another two years! Is that legal?  I put a stop pay on my checking account.  Now they are sending me an invoice.  How do I get out of this? Help!"

**09/25/17:**
"In September 2015 my mother and step-father signed up with this company for a home alarm system. Mind you at the time my mother's age was 89 and my step-fathers age was 91. They were not aware of the fact they were signing up for 5 years, or the most important part that there was no way to cancel this policy until the five years were up. . . "

89.     The following recent quotes are from some of the many customer complaints on

Consumer Affairs' website, against Defendant for failing to transfer security systems where

customers have provided effective notice that they would be moving to a new residence:

**Consumer Affairs**[20]

**09/30/15:**
". . . I have moved from east coast to the west coast. And when I called to cancel, the representative did not say anything to me about my contract or account information. So now when I have moved, I am hearing of all these consequences and stuck paying for services I am not using and do not have. . ."

**02/09/17:**
"Impossible to get service canceled once you sign 5 year contracts!  I was divorced, moved out of the house and exchanged several emails with "customer care" to have the service canceled.  My Ext took over the bank account that was being charged, so I did not know they continued to charge him for 7 months after I had the account canceled to the tune of $244.93!!! Still trying to get a refund, but I think I am hitting a wall.  I have to go find cancellation papers that were filed and put into storage when I moved.  When I called about it, the receptionist at billing said our contract was (magically) running out THIS month – what a coincidence. . . "

**08/19/17:**
". . . I put my dad in a memory care facility . . .  and am preparing his home for sale. I called Safe Home Security in an effort to explain our change in life situation and requested termination of my dad's security system service. SHS informed me that

---

[20]     https://www.consumeraffairs.com/homeowners/safe_home_security_ct.html?page=3; https://www.consumeraffairs.com/homeowners/safe_home_security_ct.html?  (all  last  visited Feb. 2, 2018).

Dad had a 5 year contract and, while they understood our situation, they could not cancel his contract unless we paid the balance of the unused contract amount of roughly $1,300.00. They offered to move the service to his new home. I explained that he is now in an assisted living facility and there is no place to move the service to. . ."

**Better Business Bureau**[21]

**01/12/18:**
    "My 95 year old mother had Safe Home Security in her home.  She moved into a nursing home in September, so we were told she had to prove she no longer lived in the "contract home."  I sent the required documents.  She continued to get bills and harassing phone calls.  Now I'm told she has to "buy out" the contract – even if she dies!  Over $1000 Safe Home says we must pay!  This contract is a disgrace!"

**07/11/16:**
    "Hello to all, I was a customer of SHS in my previous address.  I moved residences half way through my 3 year contract and was willing to take the service with me to my new address, I was informed that their provider of choice did not offer service to my new area.  Therefore, they would not be willing to set up service but I was still obligated to pay the Monthly Fee for the remain[der] of my contract.  I was [l]ivid. . . just woke up the other day to a credit warning stating I have gone down due to a collection put out against my name.  It seems they waited for my contract to expire and now they are sending a collector after me.   PLEASE NEVER USE THIS COMPANY, they are thieves."

90.    In addition to the recent examples of on-line consumer complaints, Defendant has been the subject of complaints pursued by at least two state attorneys general.

91.    In 2007, the Connecticut Attorney General's Office filed a complaint against the Defendant alleging that, among other things, automatic contract renewal provisions were illegal and a violation of the Connecticut Unfair Trade Practices Act.

92.    In 2014, the Connecticut Superior Court required Defendant to pay the state a $100,000 fine and barred it from employing unfair trade practices.[22]

---

[21]    https://www.bbb.org/connecticut/business-reviews/burglar-alarm-systems-dealers-monitoring-and-service/safe-home-security-inc-in-middletown-ct-47000796/reviews-and-complaints, respectively (all last visited Feb. 2, 2018).

[22]    https://www.bostonglobe.com/business/2016/07/22/conn-home-security-company-investigated/ITQY9mmSna0yvG0JsNT6iK/story.html (last visited Feb. 2, 2018).

93.     The Massachusetts Attorney General's office has received over 250 complaints alleging unfair or deceptive conduct by the Defendant. [23]

94.     In 2016, the Massachusetts Attorney General's office opened an investigation looking into Safe Home's contracting practices.  The investigation is currently active and ongoing.

95.     Other customers have also brought private actions regarding the Defendant's unfair and deceptive business practices in both Connecticut[24] and Massachusetts.[25]

96.     Defendant knows or should know that issues regarding its billing, termination, and contract auto-renewal have and will continue to arise, but Defendant refuses to provide a remedy to its unfair practices and deceptive contracts to cure past wrongs or prevent future occurrences.

97.     Defendant refuses to properly engage with customers concerning cancellation and billing.  Defendant regularly makes false promises, obscures contract terms, and fails to accurately explain the proper cancellation and billing procedures to its customers, including the Plaintiffs.

98.     Customers regularly end a conversation with Defendant's customer service agents believing they have cancelled their contract with Defendant, only to receive further invoices, and upon subsequent conversations, discover the contract has not been cancelled.

---

[23]     *Id.*

[24]     *See, e.g.*, *Arroyo v. Safe Home Sec.*, Case No. CV000499980S, 2002 WL 1007603 (Conn. Super. Ct. April 23, 2002).

[25]     *Chateauneuf v. Safe Home Security, Inc.*, 1179-CV-00647 (settled).

99.     Defendant regularly fails to adequately explain the contract cancellation or renewal process to its customers upon their request for more information.

100.     Defendant's practices and policies regularly cause customers to pay for services the customers are no longer using after being told by Defendant that the services were cancelled.

101.     Plaintiffs in this case have been harmed by Defendant's unlawful conduct and seek relief from the Defendant for its failure to correct its practices and pattern of engaging in fraudulent billing, contract termination and contract renewal.

## CLASS ACTION ALLEGATIONS

102.     <u>Class Definition</u>.  Plaintiffs seek to bring this action on their own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2) and/or 23(b)(3).  The proposed Class ("the Class") is defined as:

> **<u>Nationwide Class</u>**:
> All persons in the United States who entered into contracts with Defendant for home security products and services.

103.     In the alternative to the Nationwide Class, and pursuant to Federal Rules of Civil Procedure, Rule 23(c)(5), Plaintiffs seek to represent the following Michigan, North Carolina, and Missouri classes in the event that the Court declines to certify the Nationwide Class:

> **<u>Michigan Class</u>**:
> All persons in the State of Michigan who entered into contracts with Defendant for home security products and services.

> **<u>North Carolina Class</u>**:
> All persons in the State of North Carolina who entered into contracts with Defendant for home security products and services.

> **<u>Missouri Class</u>**:
> All persons in the State of Missouri who entered into contracts with Defendant for home security products and services.

104.     The Michigan Class shall be referred to herein as the "Michigan Class."

20

105.    The North Carolina Class shall be referred to herein as the "North Carolina Class."

106.    The Missouri Class shall be referred to herein as the "Missouri Class."

107.    Except where necessary to differentiate, the Nationwide Class, the Michigan Class, the North Carolina Class and the Missouri Class, and their members shall be referred to herein as the "Class," the "Classes" or "Class Members."  Excluded from the Classes are Defendant, its affiliates, employees, officers and directors, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Class definitions upon discovery and further investigation.

108.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

109.    Numerosity.  Upon information and belief, the Classes are so numerous that joinder of all members is impractical; there are approximately 200,000 Safe Home customers in the United States.  While the exact number and identities of the individual Class Members are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that the Class has thousands of members.

110.    Commonality.  All actions and inactions by the Defendant at issue here involve common questions of fact and law.  A determination that Defendant used deceptive and coercive practices to renew Class Members' contracts despite the Class' stated desire to cancel such contracts will apply to all members of the Class.  Other questions common to the Class include whether Defendant violated any applicable Connecticut and other state laws and pursued the

course of conduct complained of here, and the extent of the appropriate measure of injunctive and declaratory relief, damages, and restitution.

111.   <u>Predominance.</u>  Common questions of law and fact exist as to all members of the Class and these questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

a.   whether Defendant engaged in the conduct alleged herein;

b.   whether Defendant's conduct, as alleged herein, was unclear, unfair, deceptive, and coercive;

c.   whether Defendant violated consumer protection statutes and other laws, including but not limited to the Connecticut Unfair Trade Practices Act, the Michigan Consumer Protection Act, the North Carolina Unfair and Deceptive Trade Practices Act, and the Missouri Merchandising Practices Act through its coercive and deceptive renewal practices;

d.   whether Defendant breached its duty of good faith and fair dealing with respect to Plaintiffs and the Class;

e.   whether Defendant breached its contracts with Plaintiffs and the Class;

f.   whether Defendant has been unjustly enriched by benefits conferred upon it by Plaintiffs and the Class; and

g.   whether Plaintiffs and the Class are entitled to relief and damages, and if so, to what extent.

112.   <u>Typicality</u>.  Plaintiffs' claims are typical of the claims of all Class Members because, among other things, Plaintiffs and all Class Members were coerced into renewing their contracts with Defendant against their will and thus damaged by the same wrongful conduct of Defendant alleged herein.  The relief sought is common to the proposed Class.

113.   <u>Adequacy of Representation.</u>  Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class that they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and they

intend to prosecute this action vigorously.  The interests of the Class will thus be fairly and adequately protected by Plaintiffs and their counsel.

114.   <u>Superiority</u>.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs know of no difficulty in managing this action that would preclude its maintenance as a class action.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards of conduct for Defendant under the laws alleged herein.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Members of the Class can be readily identified and notified based on, *inter alia*, Safe Home's customer records and database.

115.   The claims of the Class may be certified under Rules 23(b)(1), (b)(2), and/or (b)(3).  The members of the Class seek declaratory and injunctive relief and also substantial money damages.

### CLAIMS FOR RELIEF

**<u>FIRST CAUSE OF ACTION</u>**
**Violation of Connecticut's Unfair Trade Practices Act**
**(Conn. Gen. Stat. Ann §§42-110a *et seq*.)**
(By Plaintiffs on Behalf of the Nationwide Class, or Alternatively, the
Michigan Class, the North Carolina Class and the Missouri Class)

116.   Plaintiffs and the Class incorporate by reference all allegations of the preceding and succeeding paragraphs as though fully set forth at length herein.

117.   This claim arises under the Connecticut Unfair Trade Practices and Consumer Protection Law ("CUTPA"), §§42-110a *et seq.*

118.    The CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. §42-110b(a).  The CUPTA further provides a private right of action under the Conn. Gen. Stat. Ann. §42-110g(a).

119.    Plaintiffs, the Class, and Defendant are "persons" within the meaning of Conn. Gen. Stat. Ann. §42-110a(3).

120.    Defendant is engaged in "trade or commerce" by contracting with consumers for monitoring and/or installation of security systems.

121.    Defendant engaged in unfair methods of competition and unfair, or deceptive acts or practices in the conduct of its security system business by:  (a) knowingly and intentionally coercing customers into renewing contracts; (b) requiring an unfair and deceptive automatic renewal provision; (c) implementing a confusing and vague cancellation procedure that Defendant did not follow; and (d) obscuring and refusing Class Members' attempts to properly cancel contracts.

122.    Additionally, Defendant violated CUTPA by failing to comply with the requirements of Conn. Gen. Stat. Ann. §42-126b(c).

123.    Defendant was under a duty to Plaintiffs to ensure that it did not conduct its business, and especially the automatic renewal of contracts, in an unfair or deceptive manner. Defendant refused to cancel Plaintiffs' contracts despite Plaintiffs having taken proper steps to cancel.  Defendant also knew that its automatic renewal provisions were unclear, vague and easily misunderstood by its customers.  Defendant has done nothing to change its unfair and deceptive practices nor make its cancellation and automatic renewal provisions more easily understood.

24

124.     Defendant breached its duty to be clear, understandable and not deceptive when contracting with its customers.

125.     As a direct and proximate result of Defendant's coercive, deceptive and unfair acts, Plaintiffs and the Class suffered substantial harm and will continue to suffer substantial harm in the form of unlawful renewal fees and any resulting consequential damages; and are now entitled to relief.

126.     Thus, Plaintiffs and the Class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

127.     A copy of this Complaint has been mailed to the Attorney General and the Commissioner of Consumer Protection of the State of Connecticut in accordance with Conn. Gen. Stat. Ann. §42-110g(c).

**SECOND CAUSE OF ACTION**
**Violation of Connecticut's Unfair Trade Practices Act: Automatic Renewals**
**Conn. Gen. Stat. Ann §42-126b(c)(1)**
(By Plaintiffs on Behalf of the Nationwide Class, or Alternatively, the Michigan Class,
the North Carolina Class and the Missouri Class)

128.     Plaintiffs and the Class incorporate by reference all allegations of the preceding and succeeding paragraphs as though fully set forth at length herein.

129.     Connecticut law provides statutory protection for consumers signing contracts containing automatic renewal clauses.

130.     Specifically, Connecticut Gen. Stat. Ann. §42-126b(c)(1) provides that any corporation that sells any products or services used for household purposes for more than 180 days pursuant to a written contract containing an automatic renewal provision of more than 31 days is required to provide the customer with a "clear and conspicuous written notice that the recipient of such products or services may cancel such contract and the procedure for such cancellation."

131.    This "clear and conspicuous" notice must be given "at least fifteen (15) days but not more than sixty (60) days prior to "the date upon which the contract will be renewed" or the expiration of the time period for cancellation," whichever is earlier.  Conn. Gen. Stat. Ann. §42-126b(c)(1).

132.    Defendant is a corporation that sells products and services used for household purposes for a period of more than 180 days under a written contract which includes an automatic renewal provision longer than 31 days.  Defendant's contract includes an automatic renewal provision for 12 months.

133.    Defendant never sent a "clear and conspicuous" notice to Plaintiffs prior to the renewal of their respective contracts.

134.    Defendant deceived and coerced Plaintiffs and Class Members into renewing their contracts against their will, by violating the statute's notice provisions, by failing to provide Plaintiffs and Class Members with a clear and conspicuous written notice that they may cancel their contract and the procedure for such cancellation.

135.    As a direct and proximate result of Defendant's coercive contracting practices and violations of Conn. Gen. Stat. Ann. §42-126b(c)(1), Plaintiffs and the Class suffered and will continue to suffer substantial harm in the form of unlawful renewal fees and any resulting consequential damages; and are now entitled to relief.

136.    Thus, Plaintiffs and the Class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
**Breach of Duty of Good Faith and Fair Dealing**
(By Plaintiffs on Behalf of the Nationwide Class, or Alternatively, the Michigan Class, the North Carolina Class and the Missouri Class)

26

137.     Plaintiffs and the Class incorporate by reference all allegations of the preceding and succeeding paragraphs as though fully set forth at length herein.

138.     Plaintiffs and the Class had contracts with Defendant for the installation and monitoring of home security services.

139.     Under Connecticut law, all contracts contain an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

140.     Defendant breached the covenant of good faith and fair dealing by, *inter alia*, repeatedly failing to: (1) transfer security services to new homes as it committed to doing; (2) provide technical assistance to transfer security to new homes; (3) clearly define contract cancellation procedures; (4) truthfully explain the contract cancellation procedures to its customers; (5) process customer's cancellation requests; (6) truthfully inform Plaintiffs and the Class of the status of their contracts with Defendant; and (7) automatically renew contracts in a fair and non-deceptive manner.

141.     Defendant further breached the covenant of good faith and fair dealing by violating various state consumer protection laws and state laws governing the automatic renewal of contracts, such as Conn. Gen. Stat. §42-126b(c)(1) and N.C. Gen. Stat. §75-41.

142.      As a direct and proximate result of Defendant's coercive contracting practices and breach of the covenant of good faith and fair dealing, Plaintiffs and the Class suffered and will continue to suffer substantial harm in the form of unlawful renewal fees and any resulting consequential damages; and are now entitled to relief; and accordingly, Defendant has been unjustly enriched.

143.     Thus, Plaintiffs and the Class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

**FOURTH CAUSE OF ACTION**
**Breach of Contract**
(By Plaintiffs on Behalf of the Nationwide Class, or Alternatively, the Michigan Class, the North Carolina Class and the Missouri Class)

144.     Plaintiffs and the Class incorporate by reference all allegations of the preceding and subsequent paragraphs as though fully set forth at length herein.

145.     Plaintiffs and the Class had contracts with Defendant for the installation and monitoring of home security services, for which they agreed to make monthly payments during the term of the contract, which was generally 36 months or longer.

146.     Plaintiffs and the Class performed under the contract by making monthly payments during the term of the contract until the term expired. Plaintiffs and Class Members provided the Defendant with more than 60 days advance notice that they did not want to renew the contract beyond its initial term.

147.     Defendant breached the contract by automatically renewing the Plaintiffs and Class Members' service plans for an additional time period, despite their proper requests to cancel.

148.     Defendant breached the contracts with Plaintiffs and the Class by violating various state consumer protection laws and state laws governing the automatic renewal of contracts, such as Conn. Gen. Stat. §42-126b(c)(1) and N.C. Gen. Stat. §75-41.

149.     Defendant further breached its contracts with Plaintiffs and the Class by retaining fees for services which they had notified Defendant that they did not want and, in many cases, were not using or receiving.

28

150.    Plaintiffs and the Class suffered injuries as a result of Defendant's breach, and are entitled to relief.

151.    Thus, Plaintiffs and the Class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

### FIFTH CAUSE OF ACTION
**Unjust Enrichment**
(By Plaintiffs on Behalf of the Nationwide Class, or Alternatively, the Michigan Class, the
North Carolina Class and the Missouri Class)

152.    Plaintiffs and the Class incorporate by reference all allegations of the preceding and subsequent paragraphs as though fully set forth at length herein.

153.    Plaintiffs and the Class bring this claim in the alternative to the breach of contract claim.

154.    Plaintiffs and the Class conferred a benefit on Defendant by paying fees for contracts Defendant wrongfully automatically renewed.  Plaintiff Carty paid a total of $515.88 at $42.99 per month for the 12-month period following the automatic renewal of her contract. Other Plaintiffs and the Class paid similar amounts to Defendant.

155.    Defendant received the full benefit of Plaintiffs and Class Members' payments, despite Plaintiffs and Class Members clearly notifying Defendant that they no longer wanted or were using Defendant's services.

156.    Plaintiffs and the Class have suffered a detriment, in that they were not released from their contracts when they notified Defendant of their desire to cancel or not renew such contracts, and were instead charged additional monthly fees beyond the contract termination period.

157.    Defendant's continued retention of the benefits which Plaintiffs and the Class conferred on it would be inequitable so that Plaintiffs and the Class are entitled to relief.

**SIXTH CAUSE OF ACTION**
**Violations of the Michigan Consumer Protection Act**
(By Plaintiff Carty on Behalf of the Michigan Class)

158.    Plaintiffs and the Class incorporate by reference all allegations of the preceding and subsequent paragraphs as though fully set forth at length herein.

159.    The Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws §§445.901 *et seq.*, is designed to provide a remedy for consumers who are injured by deceptive business practices. The MCPA expressly allows for class actions on behalf of consumers who have suffered a loss as a result of a violation of the Act.  *See* Mich. Comp. Laws §445.911(3).

160.    The MCPA deems "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce" unlawful.  Mich. Comp. Laws §445.903(1).

161.    Plaintiffs, the Class, and Defendant are "persons" within the meaning of Mich. Comp. Laws §445.902(c).

162.    Defendant engaged in the "conduct of trade or commerce" within the meaning of Mich. Comp. Laws §445.902(d).

163.    As discussed in detail herein, by engaging in a coercive, unclear, cumbersome and deceptive process for renewal of its contracts with Plaintiffs and the Class, and/or failing to cancel such contracts, Defendant's conduct constitutes unfair, unconscionable, and deceptive acts because Defendant:

a.    caused a probability of confusion or misunderstanding as to Plaintiffs' and Class Members' ability to avoid renewing their contracts with Defendant. Mich. Comp. Laws §445.903(1)(a);

b.    represented to Plaintiffs and the Class that the renewal services were desired by the Plaintiffs and the Class even though they were not. Mich. Comp. Laws §445.903(1)(k);

c.    caused a probability of confusion or of misunderstanding with respect to the authority of a representative or agent to negotiate the final terms of a transaction. Mich. Comp. Laws §445.903(1)(m);

30

d.      caused a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of Plaintiffs and the Class. Mich. Comp. Laws §445.903(1)(n);

e.      failed to reveal a material fact, the omission of which tended to mislead or deceive Plaintiffs and the Class, and which fact could not reasonably be known by Plaintiffs and the Class. Mich. Comp. Laws §445.903(1)(s);

f.      failed to restore the unlawful payments received from Plaintiffs and the Class after their contracts had been cancelled in accordance with the terms of the agreement between Defendant and Plaintiffs and the Class. Mich. Comp. Laws §445.903(1)(u);

g.      created gross discrepancies between the oral representations made by Defendant and the written contract between Defendant and Plaintiffs and the Class, and failed to provide the promised benefits or, in this case, cancellation of the contract. Mich. Comp. Laws §445.903(1)(y);

h.      made a representation of fact or statement of fact material to the transaction such that Plaintiffs and the Class reasonably believed the represented or suggested state of affairs to be other than it actually was. Mich. Comp. Laws §445.903(1)(bb); and

i.      failed to reveal facts that are material to the transaction in light of representations of fact made in a positive manner. Mich. Comp. Laws §445.903(1)(cc).

164.    As shown through their purchase of Defendant's security systems, Plaintiffs and the Class reasonably relied on Defendant's misrepresentations and omissions of material facts.

165.    Defendant intentionally and repeatedly lied, deceived, coerced, and misled Plaintiffs and the Class regarding the cancelation or renewal of their services and the process for cancelling or preventing renewal of the security services, as alleged in further detail above.

166.    Because of Defendant's violations of the MCPA, Defendant directly and proximately caused actual damage to Plaintiffs and Class Members in the form of unlawful renewal fees and any resulting consequential damages, and, if not stopped, will continue to harm Plaintiffs and the Class.

**SEVENTH CAUSE OF ACTION**
**Violations of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. §75-1.1 *et seq***
(By Plaintiff Oxendine on Behalf of the North Carolina Class)

167.    Plaintiffs and the Class incorporate by reference all allegations of the preceding and succeeding paragraphs as though fully set forth at length herein.

168.    This claim arises under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. §75-1.1 *et seq*.

169.    The UDTPA prohibits unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce.  N.C. Gen. Stat. §75-1.1(a).

170.    The UDTPA further provides a private right of action under the N.C. Gen. Stat. §75-16.

171.    Plaintiffs, the Class, and Defendant are "persons" within the meaning of the UDTPA.

172.    Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its security system business by knowingly and intentionally coercing customers into renewing contracts, failing to accept and process proper cancellations, and confusing and obscuring contract termination procedures.

173.    Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its security system business by continuously and systematically charging customers, including Plaintiffs and Class Members, for services and products the customers did not use.

174.    Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its security system business by violating the provisions regulating the automatic renewal of contracts in N. C. Gen. Stat. §75-41.

175.    Defendant was under a duty to Plaintiffs to ensure that the automatic renewal of contracts was not done in a deceptive manner.  Defendant knew that its cancellation and automatic renewal provisions were unclear and easily misunderstood by its customers.

176.    Defendant breached its duty to be clear, understandable, and not deceptive when contracting with its customers.

177.    As a direct and proximate result of Defendant's coercive, deceptive, and unfair acts, Plaintiffs and Class Members have suffered and will continue to suffer substantial harm in the form of unlawful renewal fees and any resulting consequential damages, and, if not stopped, will continue to harm Plaintiffs and the Class; and are now entitled to relief.

178.    Thus, Plaintiffs and the Class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, reasonable attorneys' fees, and treble damages pursuant to N.C. Gen. Stat. §75-16.

**EIGHTH CAUSE OF ACTION**
**Violations of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. §75-41**
(By Plaintiff Oxendine on Behalf of the North Carolina Class)

179.    Plaintiffs and the Class incorporate by reference all allegations of the preceding and succeeding paragraphs as though fully set forth at length herein.

180.    North Carolina law provides statutory protection for consumers signing contracts containing automatic renewal clauses.

181.    Specifically, North Carolina Gen. Stat. §75-41(a)(3) provides that any person engaged in commerce that sells any products or services to a consumer pursuant to a contract, where the contract automatically renews for more than 60 days must "provide written notice to the consumer by personal delivery, electronic mail, or first-class mail, at least 15 days but no earlier than 45 days before the date the contract is to be automatically renewed, stating the date

on which the contract is schedule to automatically renew and notifying the consumer that the contract will automatically renew unless it is cancelled by the consumer prior to that date."

182.    N.C. Gen. Stat. §75-41(a)(1) and (2) provide that any person engaged in commerce that sells any products or services to a consumer pursuant to a contract, where the contract automatically renews unless the consumer cancels the contract shall "disclose the automatic renewal clause clearly and conspicuously in the contract" and "disclose clearly and conspicuously how to cancel the contract in the initial contract, contract offer, or with delivery of products or services."

183.    Further, a violation of N.C. Gen. Stat. §75-41 "renders the automatic renewal clause void and unenforceable."  N.C. Gen. Stat. §75-41(e).

184.    Defendant sells goods and services to consumers pursuant to a contract that automatically renews for another 12 months.

185.    Plaintiffs, Class Members, and Defendant are "persons" within the meaning of the UDTPA.

186.    Plaintiffs and Class Members are "consumers" pursuant to the UDTPA.

187.    Defendant's contracts with Plaintiffs and the Class did not "clearly and conspicuously" explain how to cancel the contract.  The terms in the Defendant's contract were simplistic and vague.

188.    Defendant failed to send a notice to Plaintiffs and the Class, at least 15 days but not earlier than 45 days before the contract automatically renewed, stating the date on which the contract will automatically renew and explaining that the contract will renew automatically unless cancelled by Plaintiffs or Class Members.

189.    Defendant deceived and coerced Plaintiffs and Class Members by failing to comply with the UDTPA's notice provisions.  Defendant failed to provide Plaintiffs with a clear and conspicuous written notice that the recipient of such products or services may cancel such contract and the procedure for such cancellation.

190.    Defendant coerced Plaintiffs and members of the Class by failing to comply with the statute's notice provisions by providing Plaintiffs with written notice that the contract will automatically renew unless it is cancelled by the consumer.

191.    As a direct and proximate result of Defendant's deceptive and coercive contracting practices, Plaintiffs and Class Members have suffered and will continue to suffer harm in the form of unlawful renewal fees and any resulting consequential damages, and, if not stopped, will continue to harm Plaintiffs and the Class; and are now entitled to relief.

192.    Thus, Plaintiffs and the Class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, reasonable attorneys' fees, and treble damages pursuant to N.C. Gen. Stat. §75-16.

**NINTH CAUSE OF ACTION**
**Violations of the Missouri Merchandising Practices Act**
**Mo. Rev. Stat. §407.01 *et seq*.**
(By Plaintiff Armstrong on Behalf of the Missouri Class)

193.    Plaintiffs and the Class incorporate by reference all allegations of the preceding and succeeding paragraphs as though fully set forth at length herein.

194.    This claim arises under the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. §407.01 *et seq*.

195.    The MMPA prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the

35

concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce."  Mo. Rev. Stat. §407.020.

196.    Defendant engaged in the sale or advertisement of "merchandise" within the meaning of Mo. Rev. Stat. §407.010 by selling security monitoring services and equipment.

197.    Plaintiffs and the Class purchased merchandise from Defendant when entering into contracts with Defendant pursuant to Mo. Rev. Stat. §407.010.

198.    Plaintiffs and the Class purchased the home security systems for their own personal use, to be used at their homes.

199.    Plaintiffs suffered an ascertainable loss of money when Defendant knowingly and intentionally coerced customers into renewing contracts, and confused and obscured contract termination procedures.  The Plaintiffs paid for additional services that they did not use and did not want.

200.    As discussed in detail herein, by engaging in a coercive, unclear, cumbersome and deceptive process for renewal of its contracts with Plaintiffs and Class Members and/or failing to cancel such contracts, Defendant's conduct constitutes unfair, unconscionable, and deceptive acts because Defendant:

> a.    offended public policy as established by the Constitution, statutes or common law of the state of Missouri, or by the Federal Trade Commission, or its interpretive decisions. 15 Mo. CSR 60-8.020(A)1;
>
> b.    engaged in a process for renewal of its contracts that is unethical, oppressive and unscrupulous. 15 Mo. CSR 60-8.020(A)2;
>
> c.    caused substantial financial injury to numerous consumers.  15 Mo. CSR 60-8.020(B);
>
> d.    charged, attempted to collect payment and collected payment from consumers, for merchandise which the Plaintiffs and Class Members did not order or solicit from Defendant. 15 Mo. CSR 60-8.060; and

     e.      violated the common law of Missouri by breaching the covenant of good faith and fair dealing and breaching its contracts with Plaintiffs and the Class.

201.    Because of Defendant's violation of the MMPA, Defendant directly and proximately caused actual damage to Plaintiffs and Class Members in the form of unlawful renewal fees and any resulting consequential damages, and, if not stopped, will continue to harm Plaintiffs and the Class.

202.    Thus, Plaintiffs and the Class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

B.    Appoint Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

C.    Enter judgment in favor of Plaintiffs and the Class, and against Defendant;

D.    Award to Plaintiffs and the Class damages equal to the amount of all actual, special, incidental, statutory, treble, punitive, consequential and restitution damages to which Plaintiffs and the Class are entitled;

E.    Award pre-judgment and post-judgment interest on such monetary relief;

F.    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order requiring Defendant to immediately contact all customers who have provided

oral or written notice cancelling their contracts, to cancel their contracts in accordance to their request, to stop all pending electronic transfer of monitoring funds and to refund all monies collected subsequent to any cancellation notice (oral or written).

   G. Award reasonable attorneys' fees and costs, including interest, as allowed or required by law; and

   H. Grant such further relief that this Court deems appropriate.

## JURY DEMAND

   Plaintiffs hereby request a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED:  February 5, 2018   **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**

        */s/ Joseph P. Guglielmo*
        JOSEPH P. GUGLIELMO (CT 27481)
        The Helmsley Building
        230 Park Avenue, 17th Floor
        New York, NY 10169
        Telephone:  212-223-6444
        Facsimile:  212-223-6334
        *jguglielmo@scott-scott.com*

        Erin Green Comite (CT 24886)
        SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
        156 South Main Street
        P.O. Box 192
        Colchester, CT 06415
        Telephone: 860-537-5537
        Facsimile: 860-537-4432
        *ecomite@scott-scott.com*

        -and-

        **MCCUNE WRIGHT AREVALO, LLP**
        Joseph G. Sauder
        Matthew D. Schelkopf
        Joseph B. Kenney
        555 Lancaster Avenue
        Berwyn, PA 19312

Telephone:  610-200-0339
*jgs@mccunewright.com*
*mds@mccunewright.com*
*jbk@mccunewright.com*

**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
Bryan L. Clobes
1101 Market St., Suite 2650
Philadelphia, PA 19107
Telephone:  215-864-2800
Facsimile:  215- 864-2810
*bclobes@caffertyclobes.com*

**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
Daniel O. Herrera
John D. Scheflow
150 S. Wacker Dr., Suite 3000
Chicago, IL 60606
Telephone:  312-782-4880
Facsimile:  312-782-4485
*dherrara@caffertyclobes.com*
*jscheflow@caffertyclobes.com*

*Counsel for Plaintiffs and the Putative Class*